**IN THE UNITED STATES ISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Case No.: 20-cv-02811-LKG |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GOLDEN ENTERTAINMENT,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

<u>**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
By:
Debra M. Lawrence
Eric S. Thompson
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201
Tel. 410.218.2908
Debra.Lawrence@eeoc.gov
Eric.Thompson@eeoc.gov

**Table of Contents**

| | | | |
|---|---|---|---|
| I. | **INTRODUCTION** | | 1 |
| II. | **PLAINTIFF'S STATEMENT OF FACTS** | | 1 |
| | A. | **Defendant Hired Lisa Payton to Work at On the Rocks, the Most Lucrative Bar on the Property.** | 1 |
| | B. | **Bartender Brian Olinger began Making Sexual Comments to Lisa Payton During Orientation and Training.** | 2 |
| | C. | **Olinger's Conduct Escalated when Payton Began Working with Him Behind the Bar.** | 3 |
| | D. | **Lisa Payton Reported Olinger's Conduct to Her Supervisor Donald Hovatter and Richard Langton and they Told her that She would Lose her Shifts at OTR if She Continued to Press her Complaints.** | 4 |
| | E. | **Olinger's Harassment Continued After the Report to Hovatter and Langton.** | 4 |
| | F. | **Payton Reported the Matter to Human Resources which Conducted a Perfunctory Investigation and Reassigned Her to a Less Lucrative Bar.** | 5 |
| | | 1.   Payton's Report to Human Resources | 5 |
| | | 2.   The Investigation of Payton's Complaint to Human Resources | 6 |
| | | 3.   Defendant Reassigned Payton to a Less Lucrative Bar Because She Reported Harassment. | 7 |
| | G. | **Olinger Continued to Harass Payton After She was Reassigned.** | 9 |
| | H. | **Due to the Loss of Income and Continuing Harassment Payton Resigned.** | 10 |
| III. | **ARGUMENT** | | 10 |
| | A. | **The Standard for Summary Judgment** | 10 |
| | B. | **Olinger's Conduct was Severe or Pervasive.** | 10 |
| | C. | **Defendant was Negligent in Preventing and Correcting Harassment And is Therefore Liable for the Harassment Payton Suffered.** | 14 |

1.  Defendant had Actual Knowledge of the Harassment because       15
    Payton Reported the Harassment to Her Supervisor and to
    Human Resources.

2.  Defendant Also Had Constructive Knowledge of the              15
    Harassment Because it Discouraged Complaints of Harassment.

3.  Liability may be Imputed to Defendant because it Failed to     17
    Take Remedial Action Reasonably Calculated to End the
    Harassment.

D.  **Defendant Retaliated Against Payton by Assigning her to ALM.**   20

1.  By Reporting Sexual Harassment Payton Engaged in a            20
    Protected Activity.

2.  It is Undisputed that Payton was Reassigned to ALM because She  20
    Reported Sexual Harassment.

3.  Reassignment to ALM Was an Adverse Action.                    20

4.  Defendant's Argument that It Reassigned Payton Due to the     23
    Collective Bargaining Agreement is a Pretext for Retaliation.

E.  **Defendant Constructively Discharged Payton by Allowing Olinger's**   25
    **Harassment to Continue, Reassigning her to ALM, and Discouraging**
    **Complaints of Harassment.**

1.  The Record Evidence Demonstrates Payton's Working Conditions   26
    Were Intolerable.

2.  EEOC's Claim for Constructive Discharge is not Defeated       27
    Because Payton's Resignation Email Does Not Mention
    Harassment.

IV.   **CONCLUSION**                                               29

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Casino Queen, Inc*., 739 F.3d 972, 980 (4th Cir. 2014) .......................................... 22

*Amirmokri v. Baltimore Gas and Elec. Co*., 60 F.3d 1126, 1131–32 (4th Cir. 1995) ...... 14, 19, 26

*Anderson v. Liberty Lobby, Inc*. ................................................................................................... 10

*Bonar v. Romano*, 2010 WL 1258106, at \*5 (S.D. Ohio March 26, 2010) ....................... 13, N. 11

*Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999) .................................................................... 22

*Boyer-Liberto v. Fontainebleau Corp*., 786 F.3d 264, 277 (4th Cir. 2015) ................................ 11

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ............................ 21

*Carter v. California Grill*, LLC, 538 F.Supp.3d 714, 722 (W.D.Tex. 2021) ............................... 27

*Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1364 (11th Cir.1999) ......................................... 15

*Collier v. Ram Partners, Inc.,* 159 F.Supp.2d 889, 900 (D.Md. 2001) ........................................ 15

*EEOC v. Big Lots Stores, Inc*., 2018 WL 4656413, at \*7 (N.D.W.Va. Sep. 27, 2018)................ 19

*EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017) ................................................ 25

*EEOC v. Ecology Services, Inc*., 447 F.Supp.3d 420, 446 (D. Md. 2020) ................................... 23

*EEOC v. Federal Express Corp*., 188 F.Supp.2d 600, 609 (E.D.N.C. 2000)......................... 16, 19

*EEOC v. Sears Roebuck and Co*., 243 F.3d 846, 854 (4th Cir. 2001)......................................... 23

*EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008) ........................................ 14, 17

*Ellis v. Harrelson Nissan of South Carolina, LLC*, 2017 WL 9286971, at \*14 (D.S.C. May 22, 2017) ................................................................................................................................... 17

*Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir. 1991).................................................................... 19

*Evans v. International Paper Company* 936 F.3d 183, 194 (4th Cir. 2019)................................. 28

*Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) ........................................................ 14

*Giakoumakis v. Maronda Homes, Inc. of Fla.*, 2010 WL 11507432 at *7 (M.D.Fla. Mar. 26, 2010) ................................................................................................................ 28

*Goad v. North Carolina Farm Bureau Mutual Insurance Company, Inc.*, 2017 WL 6001821, at *3 (December 4, 2017) ................................................................................................ 16

*Green v. Brennan*, 578 U.S. 547, 555 (2016) ............................................................. 25

*Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 812 (7th Cir. 2000) ........................... 19

*Howard v. Winter*, 446 F.3d 559, 570 (4th Cir. 2006) .................................................. 17

*Jones v. Family Health Centers of Baltimore*, Inc., 135 F.Supp.3d 372, 379 (D.Md. 2015) . 11, 13

*Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 551–52 (4th Cir. 2015) .................. 20

*Lowe v. CUSA, LLC*, 2011 WL 13334284, at *11 (S.D.N.Y. Sep. 29, 2011) .............. 27

*Magnuson v. Peak Technical Serv. Inc.*, 808 F. Supp. 500, 504 (E.D. Va. 1992) ........ 11

*Martin Marietta Corp. v. Maryland Com'n on Human Relations*, 38 F.3d 1392, 1403 (4th Cir.1994) ................................................................................................................ 24

*Martin v. MCAP Christiansburg, LLC*, 143 F.Supp.3d 442, 447 (W.D.Va. 2015) ...... 12

*Matvia v. Bald Head Island Management, Inc.,* 259 F.3d 261, 271 (4th Cir. 2001) ..... 20

*Miles v. DaVita Rx*, LLC, 962 F.Supp.2d 825, 831 (D.Md. 2013) ......................... 13, 19

*Ocheltree v. Scollon Productions,* 335 F.3d 325, 334 (4th Cir. 2003) ......................... 14

*Okoli v. City of Balt.*, 648 F.3d 216, 221 (4th Cir. 2011) ............................................. 12

*Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81 (1998) ................................... 13

*Ortiz v. Big Bear Events LLC*, 2013 WL 247444, at *3 (W.D.N.C. Jan. 23, 2013) ..... 22

*Paroline v. Unisys Corp.* 879 F.2d 100, 102-103 (4th Cir. 1989) ...................... 11, 12, 17

*Pennsylvania State Police v. Suders,* 542 U.S. 129, 141 (2004). .................................. 25

*Ray v. International Paper Company*, 909 F.3d 661, 670 (4th Cir. 2018) ..................... 22

*Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 147 (2000) ........................................ 23

*Smith v. First Union Nat. Bank*, 202 F.3d 234, 245 (4th Cir. 2000)................................................ 17

*Steiner v. Showboat Op. Co.,* 25 F.3d 1459, 1464 (9th Cir.1994), *cert. denied,* 513 U.S. 1082
 (1995) ............................................................................................................................................ 19

*Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 332 (4th Cir. 2018).................................. 14

*Vance v. Ball State Univ.*, 570 U.S. 421, 448–49 (2013)........................................................ 14, 16

*Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014).............................. 12, 13

*Williams v. Silver Spring Volunteer Fire Dept.*, 86 F.Supp.3d 398, 413 (D.Md. 2015)............... 13

## **Other Authorities**

EEOC Compliance Manual (CCH) § 615.4(a)(9)(iii), ¶3103, at 3213 (1988)") ......................... 19

Fed. R. Civ. P. 56(a)…………………………………………………………………………..10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **U.S. EQUAL EMPLOYMENT** ) | |
| **OPPORTUNITY COMMISSION,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | Case No. 20-cv-02811-LKG |
| **GOLDEN ENTERTAINMENT, INC.** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

## I.   INTRODUCTION

The Equal Employment Opportunity Commission ("EEOC" or "the Commission")

brought this action against Defendant, Golden Entertainment, Inc. ("Defendant"), alleging that it

violated Sections 703(a)(1) and 704(a)(1) of Title VII of the Civil Rights Act of 1964 ("Title

VII") by subjecting Lisa Payton to hostile work environment sexual harassment, retaliation, and

constructive discharge. Title VII entitles Payton to a work environment not intolerable due to

reprisal and unchecked harassment based on sex. The Commission hereby opposes Defendant's

motion for summary judgment.

## II.  PLAINTIFF'S STATEMENT OF FACTS

### A.   Defendant Hired Lisa Payton to Work at On the Rocks, the Most Lucrative Bar on the Property.

Lisa Payton sought bartending work with Defendant after relocating to Maryland from

Missouri. Exhibit J, J.R. 1235 (Declaration of Lisa Payton (Payton decl.) at ¶8). Having worked

as a Co-Director of an arts and music festival, an Administrative Assistant, a self-employed

designer, and a bartender, she was drawn to Defendant because it was a four-star casino resort

1

with a union. *Id.* at ¶¶ 9-10. Defendant found Payton to be an experienced bartender with management potential. Exhibit A-09, J.R. 514-515 (Deposition of Nicholas Nies (Nies dep.) p. 55:20-p. 56:14); Ex. D, J.R. 1127-1128 (Deposition of Donald Hovatter (Hovatter dep.) p. 30:17-p. 31:17).

Payton began work on May 31, 2017. Exhibit A-11, J.R. 653-54 (Deposition of Lisa Payton (Payton dep.) p. 24:14-p. 25:2). Defendant's casino has two bars, On the Rocks (OTR) and A Little Munch (ALM). OTR is the highest volume bar and usually generates the most money in tips. Exhibit A-10, J.R. 595 (Deposition of Brian Olinger (Olinger dep.) p. 32:3-6). Due to her skill set, Lisa Payton was hired to work at OTR. Ex. A-11, J.R. 652-53; 730 & 795 (Payton dep. p. 25:14-20; p. 102:7-11 & p. 167:11-19).

### B. Bartender Brian Olinger began Making Sexual Comments to Lisa Payton During Orientation and Training.

Brian Olinger is a bartender who has been employed with Defendant since 2013. He works primarily at OTR and is regarded as highly competent but arrogant, territorial, and intimidating. Ex D, J.R. 1137 (Hovatter dep. 40:8-16); Exhibit A-08, J.R. 423 (Deposition of Amber Navalaney (Navalaney dep.) p. 20:2-12). Exhibit K, 1265-1266 (Deposition of Katelyn Asare (Asare dep.) p. 28:20-p. 29:14). When Payton, during her orientation, toured the casino, Olinger looked directly at her and commented about her buttocks. Ex. A-11, J.R. 703-6 (Payton dep. p. 75:12-p. 78:1); Ex. J, J.R. 1236 (Payton decl. at ¶11). Payton ignored him and tried to focus on the tour. Ex. J, J.R. 1236 (Payton decl. at ¶11). Following orientation, Defendant assigned Olinger to train Payton on drink recipes and the daily operations of the bar. Ex. A-10, J.R. 598 (Olinger dep. p. 35:3-13). During the two training sessions, Ex. A-11, J.R. 711 (Payton dep. p. 83:13-18), Olinger would sniff and smell Payton, whispering in her ear such things as "you smell good enough to eat," and "I could eat you from front to back." Ex. A-11, J.R. 712;

2

714 (Payton dep. p. 84:3-20; p. 86:9-14); Ex. J, J.R. 1236 (Payton decl. at ¶13). The comments

were constant. *Id.* She told him that he was making her uncomfortable, but he continued. *Id.* This

occurred nearly every shift. Ex. A-11, J.R. 716 (Payton dep. p. 88:11-14). Payton felt scared. Ex.

A-11, J.R. 712 (Payton dep. p. 84:3-20).  She discussed Olinger's behavior with her co-worker,

Teresa Jay. Ex A-11, J.R. 0737-38 (Payton dep. p. 109:4-110:9); Ex. J, J.R. 1236 (Payton decl. at

¶17). Jay warned her that when women complained about his harassment, the company did not

take action against him, but, instead, the women lost shifts at OTR or had their hours reduced. *Id.*

Payton therefore did not report the initial comments to management because she feared

Defendant would retaliate against her by taking away her shifts. Ex A-11, J.R. 715; 737-38

(Payton dep. p. 87:1-9; p. 109:4-p. 110:9).

### C.   Olinger's Conduct Escalated when Payton Began Working with Him Behind the Bar.

When Payton completed her training, Defendant assigned her to work shifts with Olinger

behind the bar at OTR. He then became more aggressive. Ex. A-11, J.R. 710-11 (Payton dep. p.

82:8-p. 83:2). He constantly commented on her buttocks saying "Oh, you work out- I bet you

spend a lot of time on that ass," "Oh, what I would do to your ass," "Oh, one night with your

ass," and other related comments. Ex. A-11, J.R. 745 (Payton dep. p. 117:9-19); Ex. J, J.R. 1236

(Payton decl. at ¶¶13-14). Nearly every shift he would whisper in her ear about things he would

like to do to her buttocks, and he would grope her buttocks and touch her hips. Ex. A-11, J.R.

691-692 (Payton dep. 63:2-64:3); Ex. J, J.R. 1236 (Payton decl. at ¶¶13-15). When he grabbed

her, she would move away as quickly as possible and turn to look at him. Ex. J, J.R. 1236

(Payton decl. at ¶¶15-16). Several times she reiterated that he was making her uncomfortable. *Id.*

On two occasions Olinger came behind Payton while she was pouring beer from a tap, reached

around her and pressed himself against her buttocks so that she could feel his genitals pressing

into her. Ex. A-11, J.R. 731-32, 734 & 939 (Payton dep. p. 103:5-p. 104:16; p. 106:8-12; Exhibit Y to the Deposition of Lisa Payton). The first of these assaults was witnessed by Jana Cannon, a co-worker. Ex. E, J.R. 1167-1168 (Declaration of Jana Cannon (Cannon decl.) at ¶¶ 1-7). Cannon saw Olinger move behind Payton while she was using the tap, put his arm around her, and press himself up against her. *Id.*  Payton was visibly shaken by the assault. *Id.* at ¶7.

### D. Lisa Payton Reported Olinger's Conduct to Her Supervisors Donald Hovatter and Richard Langton and they Told her that She would Lose her Shifts at OTR if She Continued to Press her Complaints.

Understanding that Olinger appeared protected by management, Payton feared that she would be subject to retaliation, but nevertheless reported Olinger's harassment to her supervisors Donald Hovatter and Richard Langton on July 14, 2017. Ex. A-11, J.R. 731-732; 736-737 (Payton dep. p. 103:14-p. 104:14; p. 108:15-p. 109:3). Hovatter and Langton were the proper company officials for receiving reports of harassment. Exhibit A-04, J.R. 146 (Deposition of Sheri Hollister[1] (Hollister dep.) p. 41:15-22). In response to Payton's complaint, Langton warned, "do not make waves. Nothing will happen to Brian. It will only happen to you. Do not make waves." Ex. A-11, J.R. 732 (Payton dep. 104:5-16). Hovatter, in response, told her that if she pressed her complaint, she would primarily be assigned to ALM which would reduce her earnings. *Id*.

### E. Olinger's Harassment Continued After the Report to Hovatter and Langton.

Following Hovatter's and Langton's warning to Payton, she continued to fear losing her shifts. Ex. A-11, J.R. 933. (Exhibit R to the Deposition of Lisa Payton). As far as she could observe, they took no action on her complaint, Ex. A-11, J.R. 737 (Payton dep. p. 109:4-14), and

---

[1] During Payton's tenure with Defendant, Sheri Hollister served as its Interim Human Resources director as an independent contractor working from her home in Minnesota. Ex. A-04, J.R. 115-118 (Hollister dep. 10:19-13:7).

just five days thereafter, on July 19, 2017 Olinger came into work on his day off, approached

Payton behind the bar, and again pressed his genitals against her buttocks. Ex. J, J.R. 1236-37

(Payton decl. at ¶¶18-21).

### F.   Payton Reported the Matter to Human Resources which Conducted a Perfunctory Investigation and Reassigned Her to a Less Lucrative Bar.

1.   <u>Payton's Report to Human Resources</u>

Immediately following the July 19th incident, Payton reported Olinger's conduct to

Human Resources. Exhibit J, J.R. 1235-36 (Payton decl. at ¶¶7-9); Ex. A-11, J.R. 739 (Payton

dep. p. 111:1-19); Exhibit G, J.R. 1231 (Exhibit N[2] to the Deposition of Lisa Payton). She met

with Ann Brown, a member of Defendant's Human Resources staff, and told her about Olinger's

repeated inappropriate touching and remarks about her buttocks. Ex. A-11, J.R. 743 (Payton dep.

115:19-21); Exhibit G, J.R. 1231 (Exhibit N to the Deposition of Lisa Payton). Brown referred

Payton to Interim Human Resources director Sheri Hollister. Ex. A-11, J.R. 745 (Payton dep. p.

117:3-4).

Payton met with Hollister the following day. Exhibit A-04, J.R. 130 (Hollister dep. p.

25:16-18). She shared with Hollister everything she had told to Brown and also told Hollister

that Amber,[3] a bartender and server, had also complained to her about Olinger. Ex. A-04, J.R.

162 (Exhibit 3 to the Deposition of Sheri Hollister); Ex. J, J.R. 1237 (Payton decl. at ¶22).

Payton then made a written statement which included a request that Defendant interview her co-

workers regarding Olinger's conduct. Ex. A-11, J.R. 934 (Exhibit R to the Deposition of Lisa

Payton).

---

[2] Exhibit N does not contain an accurate description of Olinger's conduct. J.R. A-11, 738-739
(Payton dep. 110:10-111:8). Brown asked Payton more questions about Jamie Scott, another
bartender, than Olinger. A-11, J.R. 740 (Payton dep. p. 122:12-18).
[3] Payton did not know Amber's last name. Ex. J, J.R. 1237 (Payton decl. at ¶22).

5

2.      The Investigation of Payton's Complaint to Human Resources

Hollister claims to have investigated Payton's complaint by interviewing Olinger,

Hovatter, and Langton and reviewing video footage of the casino. Ex. A-04, J.R. 120-121

(Hollister dep. p. 15:12-p. 16:13). Hovatter, however, denies being questioned about the

harassment. Ex. D, J.R. 1143 (Hovatter dep. p. 46:9-22). Hollister intended to conclude her

investigation prior to her departure from the company on August 5, 2017. Ex. A-03, J.R. 66-67

(Deposition of Tom Hendrixson[4] (Hendrixson dep.) p. 17:14-p. 18:4). Even though she lived in

Minnesota and did not keep regular hours at Defendant, she was able to meet her self-imposed

deadline. *Id.* & Ex. A-04, J.R. 123-124 (Hollister dep. p. 18:21- p. 19:4). Hollister did not reach

out to Payton to share the results of the investigation. Ex. A-11, J.R. 763-64 (Payton dep. p.

135:20-p. 136:21). When Payton reached out to Hollister about its status, Hollister claimed that

she had done her "due diligence" and the matter was closed. *Id.* Hollister never spoke to the

woman named Amber whom Payton had identified in her written statement, Ex. A-04, J.R. 133-

134 (Hollister dep. 28:12-29:1), and as noted above, she did not speak with Hovatter.

Had Hollister reached out to Amber, as suggested by Payton, she would have learned that

Amber[5] Navalaney, a bar tender and beverage server for Defendant, Exhibit A-08, J.R. 412-

413(Navalaney dep. p. 9:21-p. 10:1), also was subjected to Olinger's unwelcome sexual contact.

Ex. A-08, J.R. 424-25 (Navalaney dep. p. 21:19-21). He flirted with her, bumped against her, Ex.

A-08, J.R. 424-25 (Navalaney dep. p. 21:22-p. 22:8), slid past her at the bar with his front

rubbing against her buttocks, *id.,* so that she could feel the imprint of his genitals against her

---

[4] Tom Hendrixson replaced Sherri Hollister as Human Resources Director for Defendant.
Hollister only served as Human Resources Director in an interim capacity. Ex. A-03, J.R. 59-60
(Hendrixson dep. 10:22-11:15).
[5] EEOC, in this litigation, learned that her last name is Navalaney.

buttocks. Ex. A-08, J.R. 425-426 (Navalaney dep. p. 22:20-23:10). She believes that this conduct was intentional. Ex. A-08, J.R. 441 (Navalaney dep. p. 38:5-10).

Not only did Hollister fail to interview witnesses suggested by Payton, Defendant unduly limited the review of video surveillance footage of Payton's interactions with Olinger at the bar. Payton had requested a review of all Friday and Saturday shifts, which would have corroborated her allegations, especially if she had been invited to view the footage alongside the reviewer and highlight the unwanted sexual contact. Ex. A-11, J.R. 933 (Exhibit R to the Deposition of Lisa Payton). Instead, William Liggett, Defendant's surveillance manager, Exhibit A-07, J.R. 345 (Deposition of William Liggett (Liggett dep.) p. 12:4-17), never consulted Payton about the particular shifts to review, Ex. A-07, J.R. 374-75 (Liggett dep. p. 41:17-42:5), nor did he ask her to assist in the review. Instead of reviewing footage dating back a few weeks to July 7,[6] on July 21, 2017, he reviewed footage of Olinger and Payton working together Friday July 14, 2017 and Wednesday July 19, 2017 and spent just two hours reviewing 16 hours of footage. Ex. A-07, J.R. 375; 380 (Liggett dep. 42:3-5 & 47:12-16); Exhibit H, J.R. 1232-1233 (Exhibit 1 to the Deposition of William Liggett). In fact, this was all the footage he could recall reviewing. Ex. A-07, J.R. 376-778 (Liggett dep. p. 43:22-p. 45:4). Liggett failed to preserve the footage he reviewed even though he had discretion to preserve footage indefinitely. A-07, J.R. 355; 374-75 (Liggett dep. p. 22:9-19; p. 42:2-5).

   3.   <u>Defendant Reassigned Payton to a Less Lucrative Bar Because She Reported Harassment</u>.

---

[6] The State of Maryland requires that video footage from casinos be preserved for two weeks. Ex. A-07, J.R. (Liggett dep. 43:22-45:4). Liggett therefore could have reviewed footage going back to July 7, 2017, two additional weeks beyond what Hollister requested. *Id*.

Because Payton complained about harassment from Olinger, Defendant no longer scheduled the bartenders to work together. ECF No. 38-1 Defendant's Memorandum of Law in Support of Motion for Summary Judgment (Def. Memo) at 12. Once separated, Olinger worked at OTR and Payton primarily was assigned to ALM. Exhibit A-09, J.R. 512 (Nies[7] dep. p. 53:18-22). ALM is in the entranceway to the casino, Ex. D, J.R. 1117 (Hovatter dep. p. 20:2-11), and was a disfavored assignment because it is more demanding than OTR. Exhibit A-05, J.R. 209 (Deposition of Teresa Jay (Jay dep.) at p. 46:8-18). One bartender is responsible for making coffee, sandwiches, pizza, fries, burgers, and snack items. *Id.* & Ex. A-11, J.R. 684 (Payton dep. p. 56:13-21). It is more of a convenience store than a bar, and it generates fewer tips because patrons do not tip on food items. *Id.*; J.R. 1209-1210 (Langton dep. p. 41:9-p. 42:14).

OTR was the most lucrative bar on the property. Ex. A-02, J.R. 27-28 (Deposition of Robert Arbogast[8] (Arbogast dep.) at p. 14:21-p. 15:1). Olinger made $200 to $350 a night working there. A-10, J.R. 587 (Olinger dep. p. 24:5-13). It is the largest bar on the property, is located inside the casino, has gambling machines built into the bar, has a more extensive liquor inventory, and draws the most guests. Ex. D, J.R. 1116-1118; 1131 (Hovatter dep. p.19:16-p. 21:18; p. 34:9-11); Ex. F, J.R. 1185 Langton dep. p. 17:11-20). Nearly every drink served by a bartender at OTR generates a tip. Ex. A-11, J.R. 784-785 (Payton dep. p. 156:17- p. 157:7). Payton was making as much as $200 nightly at OTR but as little as $35 a night at ALM.[9] Ex. A-11, J.R. 732-733 (Payton dep. p. 104:17-p. 105:14).

---

[7] Nicholas Nies served as food and beverage manager during the summer of 2017. He was responsible for scheduling during this period. Ex. A-09, J.R. 471. (Nies dep. p. 12:7-17).

[8] Arbogast worked as restaurant manager. He was responsible for preparing the schedule for Nies' approval. Ex. A-02, J.R. 23 (Arbogast p. 10:1-22).

[9] Payton does not have records of her earnings. Most tips were in cash. Ex. A-11, J.R. 786-787 (Payton dep. 158:21-159:2). Her earnings statements reflect only credit card tips. Exhibit B-3, J.R. 1060-1069. Defendant's time clock has a feature that allows bartenders and servers to record

Payton emailed Nies on August 29, 2017 protesting the loss of shifts at OTR. Ex. A-9, J.R. 513 (Nies dep. p. 54:21-p. 55:2); Ex. A-11, J.R. 935 (Payton dep. at Ex. V). Thereafter, Defendant assigned her just two shifts at OTR in a one-month period, Ex. B-05, J.R. 1084-1088 (Payton Schedule), still a significant reduction from the two to four times per week she had worked there before reporting Olinger's harassment. Ex. B-5, J.R. 1073-1079 (Payton Schedule).

### G.   Olinger Continued to Harass Payton After She was Reassigned.

Defendant's removal of Payton from the lucrative OTR assignments did not end the harassment. Ex. A-09, J.R. 775 (Payton dep. p. 147:11-14). She still had to see him at pre-shift meetings, Ex. A-11, J.R. 716-17 (Payton dep. p. 88:15-p. 89:5), and as Olinger and Payton would leave the meeting to go to the vault to get money for their bars, Olinger would lean into her and make comments in her ear such as, "I'll make whatever comments I want to make about your rear-end and nothing is going to be done about it." Ex. A-11, J.R. 724-726 (Payton dep. p. 96:21-p. 98:19). He also told her that she would not win, and he would not be defeated. *Id.* He made these comments while walking next to her, keeping pace with her, and keeping as close to her as possible with his face close to her ear. *Id*. On another occasion, he walked by her and addressed her as "bitch." Ex. A-11, J.R. 941 (Exhibit Y to the Deposition of Lisa Payton). Payton did not report Olinger's continued conduct to Human Resources because she was already losing shifts at OTR. Ex. A-11, J.R. 729 (Payton dep. p. 101:4-20). She did, however, report the matter to her union. Ex. A-11, J.R. 776 (Payton dep. p. 148:11-15). The union wrote several letters which failed to sway Defendant and then the union closed the matter. *See generally* Ex. A-12, J.R. 945-921 (UFCW Local 27 file).

---

their cash tips in the time clock but did not train Payton on this feature. Ex. A-11, J.R. 799-800 (Payton dep. p. 171:15-p. 172:9).

**H.      Due to the Loss of Income and Continuing Harassment Payton Resigned.**

Payton resigned on September 22, 2017 because of Defendant's failure to terminate the hostile work environment created by Olinger and because the attempts to separate her from him only resulted in a significant decline of income. Ex. A-11, J.R. 675-76 (Payton dep. p. 47:17-p. 48:10); J.R. 931 (Payton dep. Ex. L Resignation Email). Her resignation email did not discuss Olinger's harassment because her union representative had advised her against discussing it. Ex. A-11, J.R. 677 (Payton dep. p. 49:8-14). Instead, she alluded to the situation by writing that there was a lack of unity and teamwork. Ex. A-11, J.R. 678 (Payton dep. p. 50:2-8). The resignation email also detailed her frustration with being assigned to ALM and Defendant's lack of response to her scheduling complaints. Ex A-11, J.R. 931 (Payton dep. Ex. L Resignation Email).

Defendant accepted Payton's resignation and barred her from employment for one year. Exhibit B-1, J.R. 969 (Kurtz decl. ¶15); Exhibit B-6, J.R. 1090 (Action Notice). Defendant offers the best opportunity for bartenders in the surrounding area including Cumberland, Maryland, Bedford, Pennsylvania and Berkley Springs, West Virginia. Ex E, J.R. 1168 (Cannon decl. at ¶¶ 14-15). Olinger continues to work there. Ex. A-10, J.R. 574 (Olinger dep. p. 11:1-5).

### III. ARGUMENT

**A.      The Standard for Summary Judgment**

Summary judgment is appropriate only when there is no dispute as to a material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Summary judgment is appropriate only if a rational trier of fact could not find for the non-moving party in light of the record as a whole. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). In making this assessment, "'plaintiff's version of the facts must be presented where the parties' versions conflict, at least to the degree

10

that her allegations have support in affidavits, deposition or other documentary evidence."

*Magnuson v. Peak Technical Serv. Inc*., 808 F. Supp. 500, 504 (E.D. Va. 1992), (quoting

*Paroline v. Unisys Corp.* 879 F.2d 100, 102-103 (4th Cir. 1989), *vacated in part on other*

*grounds*, 900 F.2d 27 (4th Cir. 1990). The discussion below, and the evidence in support thereof,

preclude the issuance of summary judgment for Defendant.

### B.   Olinger's Conduct was Severe or Pervasive.

To establish a claim for hostile work environment sexual harassment under Title VII, a

plaintiff must prove that (1) the subject conduct was unwelcome; (2) it was based on the sex of

the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of

employment and to create an abusive working environment; and (4) it was imputable on some

factual basis to the employer. *See Boyer-Liberto v. Fontainebleau Corp*., 786 F.3d 264, 277 (4th

Cir. 2015) (reversing District Court finding that a single use of a racial epithet did not create a

hostile work environment); *See also Jones v. Family Health Centers of Baltimore*, Inc., 135

F.Supp.3d 372, 379 (D.Md. 2015) (*Boyer-Liberto* "altered the landscape of hostile work

environment litigation" by holding that isolated use of an epithet could be "severe enough to

engender a hostile work environment."). Because Defendant does not dispute that the conduct

was unwelcome and based on Payton's sex, EEOC will not address these elements. Instead,

Defendant argues that summary judgment is warranted as Olinger's conduct toward Payton was

not severe or pervasive. ECF No. 38-1 Def. Memo at 15. Whether repeated rubbing of Olinger's

genitals against Payton's buttocks, coupled with repeated remarks about her buttocks and groping

them, is severe or pervasive, remains an issue of fact and not appropriate for resolution at

summary judgment.[10] *Paroline, supra* at 105 (holding that severity or pervasiveness is an issue of fact and reversing district court finding that unwanted sexual touching and comments were not severe and pervasive as a matter of law.); *Martin v. MCAP Christiansburg, LLC*, 143 F.Supp.3d 442, 447 (W.D.Va. 2015) (holding that record evidence of one incident where the plaintiff was groped and further evidence of sexual comments raised a jury question as to whether the conduct was severe or pervasive).

To demonstrate that conduct is severe or pervasive, the plaintiff must first show that the employee was subjectively offended and then further demonstrate that a reasonable person in the employee's position would have found the conduct abusive or hostile. *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 208 (4th Cir. 2014) (reversing district court finding that conduct was not severe or pervasive as a matter of law). Payton was clearly subjectively offended. Ex. A-11, J.R. 936-937 (Exhibit Y to the Deposition of Lisa Payton). She found Olinger's behavior to be distressing to the point where she was moved to tears. *Id*. EEOC has therefore satisfied the first prong of the test.

There is also sufficient evidence supporting a finding in EEOC's favor on the second prong of the test. Olinger created an objectively hostile environment by groping Payton's buttocks. Exhibit A-1, J.R. 691-692 (Payton dep. p. 63:2-p. 64:3); *See Okoli v. City of Balt.*, 648 F.3d 216, 221 (4th Cir. 2011) (reversing a district court's grant of summary judgment and holding that "repeated propositioning and physical touching" was sufficiently severe to create a

---

[10] [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems*, Inc., 510 U.S. 17, 23 (U.S. 1993).

hostile work environment). It is also well-settled that an objectively hostile environment is created when a male harasser presses his genitals into a female employee. *Jones, supra* at 379 (denying summary judgment where harasser bumped into the plaintiff causing his genitals to rub against her); *Paroli v. DaVita Rx*, LLC, 962 F.Supp.2d 825, 831 (D.Md. 2013) (denying summary judgment where harasser positioned himself behind the plaintiff while she was backing out of a room so that her buttocks bumped against his crotch); *Williams v. Silver Spring Volunteer Fire Dept.*, 86 F.Supp.3d 398, 413 (D.Md. 2015) (denying summary judgment where the harasser touched his genitals against the plaintiff's lap).

In addition to physical touching, Olinger made sexual and threatening comments that continued after Payton was reassigned to ALM. The conduct that occurred after reassignment was also severe or pervasive. Olinger continued to whisper into Payton's ear after Defendant moved her to ALM and he addressed her as "bitch." Ex. A-11, J.R. 724-726 (Payton dep. p. 96:21-p. 98:18); J.R. 941 (Exhibit Y to the Deposition of Lisa Payton). Even without physical touching, sexually-charged remarks can constitute actionable harassment. *Walker, supra* at 209 (citing *Hoyle v. Freightliner, LLC,* 650 F.3d 321, 334-35 (4th Cir.2011)); *See also Bonar v. Romano*, 2010 WL 1258106, at *5 (S.D. Ohio March 26, 2010) (holding that approaching employee from behind and whispering in her ear contributed to hostile work environment.) Further, Olinger's post-reassignment conduct must be viewed in light of his prior groping and pressing his genitals against her. Sexual harassment cases must be analyzed "with careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75, 81 (1998). After Defendant removed Payton from OTR he referenced his prior harassment and told her "I'll make whatever comments I want to make about your rear-end, and nothing is going to be done about it." Ex. A-11, J.R. 724-726 (Payton

dep. 96:21-98:18). When he made this threat, Payton had already suffered a loss of income because of her complaints against him and yet he boasted of further impunity. Under these facts, a finding that Olinger's conduct, as a matter of law, did not create a hostile work environment is inappropriate.

### C.     Defendant was Negligent in Preventing and Correcting Harassment and is Therefore Liable for the Harassment Payton Suffered.

An employer has a duty to use reasonable care to protect employees from harassment by co-workers. *Vance v. Ball State Univ.*, 570 U.S. 421, 448–49 (2013) ("Assuming that a harasser is not a supervisor, a plaintiff could still prevail by showing that his or her employer was negligent in failing to prevent harassment from taking place."); *Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) (recognizing an "affirmative obligation" to prevent harassment). In cases of co-worker harassment, the plaintiff bears the burden of proving that the defendant was negligent. *Vance, supra* at 448-49. An employer is liable for co-worker harassment if it knew or should have known about the harassment and failed to take prompt and effective remedial action reasonably calculated toward ending the harassment and preventing its recurrence. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 332 (4th Cir. 2018); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).

 "Knowledge of harassment can be imputed to an employer if a reasonable person, intent on complying with Title VII, would have known about the harassment." *Ocheltree v. Scollon Productions,* 335 F.3d 325, 334 (4th Cir. 2003) (internal quotations omitted). Once the employer has notice, then it must respond with remedial action "reasonably calculated to end the harassment." *Amirmokri v. Baltimore Gas and Elec. Co.*, 60 F.3d 1126, 1131–32 (4th Cir. 1995). Here, liability can be imputed to Defendant because it had actual and constructive knowledge of

the harassment, conducted a negligent investigation, punished Payton by assigning her to ALM, and failed to separate Payton from Olinger.

       1.      <u>Defendant had Actual Knowledge of the Harassment because Payton Reported the Harassment to Her Supervisors and to Human Resources</u>.

Liability can be imputed to Defendant because Payton twice reported sexual harassment to company officials and after each report the harassment continued. If an employer has a company policy specifically designating the person to whom an employee should report harassment, once the employee complains to the designated person or persons, the employer is deemed to have actual notice of the harassment. *Collier v. Ram Partners, Inc.,* 159 F.Supp.2d 889, 900 (D.Md. 2001); *Coates v. Sundor Brands, Inc.,* 164 F.3d 1361, 1364 (11th Cir.1999).

Payton first reported the harassment to Hovatter and Langton. Ex. A-11, J.R. 731; 736-737 (Payton dep. p. 103:14-20; p. 108:15-p. 109:3). They were the proper company officials for receiving reports of harassment. Ex. A-04, J.R. 146 (Hollister dep. p. 41:15-22). A few days after this report, Olinger again pressed his genitals against Payton's buttocks. Ex. J, J.R. 1236-37 (Payton decl. at ¶¶18-21). She then, against Hovatter and Langton's advice, reported the matter to Human Resources. Ex. A-11, J.R. 738-39 (Payton dep. p. 110:10-111:19); Exhibit G, J.R. 1231 (Exhibit N to the Deposition of Lisa Payton). Despite the second report, the harassment continued. Ex. A-11, J.R. 724-726; 775 (Payton dep. p. 96:21-p. 98:18; p. 147:11-14). Thus, there is sufficient evidence of actual notice to preclude an award of summary judgment.

       2.      <u>Defendant Also Had Constructive Knowledge of the Harassment Because it Discouraged Complaints of Harassment</u>.

There is also evidence that Defendant had constructive knowledge of the harassment even prior to Payton's complaints to Hovatter and Langton. Evidence that an employer acted to discourage complaints of harassment is relevant to show that liability should be imputed to an

employer for harassment caused by a co-worker. *Vance, supra* at 448-449. When Olinger began to harass her, Payton did not report it because she believed that Defendant would retaliate against her. Ex. A-11, J.R. 715; 737-38 (Payton dep. p. 87:1-9; p. 109:4-p. 110:9). This information was based on her co-worker's advice that the company never took action against Olinger. Ex. A-11, J.R. 737-38 (Payton Dep. p. 109:4-p. 110:9). When the harassment escalated, and Payton reported Olinger's conduct to Langton and Hovatter, designated by Defendant to receive such reports, they told her that she would stop getting shifts at OTR if she pressed her complaints. Ex. A-11, J.R. 731-32 (Payton dep. p. 103:21-p. 104:16). She elected to pursue her complaints and lost her shifts at OTR. ECF No. 38-1 Def. Memo at 12; Exhibit A-09, J.R. 512 (Nies dep. p. 53:18-22). Following the reassignment, Payton did not report additional harassment because she feared further reprisal. Ex. A-11, J.R. 729 (Payton dep. p. 101:4-20). Defendant, therefore, actively discouraged harassment complaints and must be charged with constructive knowledge of the harassment.

Courts in the Fourth Circuit have held in co-worker harassment cases that an employer has constructive knowledge of harassment when employees are aware of consequences for reporting harassment or supervisors actively discourage complaints. *Goad v. North Carolina Farm Bureau Mutual Insurance Company, Inc*., 2017 WL 6001821, at *3 (December 4, 2017) (there is a material issue of fact regarding constructive knowledge where employer witnessed retaliation against another employee who had complained and her supervisor discouraged her from complaining outside the office); *EEOC v. Federal Express Corp*., 188 F.Supp.2d 600, 609 (E.D.N.C. 2000) (there is a material issue of fact regarding constructive knowledge where supervisor discouraged complaints).

16

Fourth Circuit cases involving harassment by supervisors are also instructive on analyzing whether the employer was negligent in permitting the harassment. The plaintiff's burden of proving negligence in a co-worker case and the defendant's burden of proving reasonable care to prevent harassment to establish the *Farager-Ellerth* defense, are "two sides of the same coin." *Ellis v. Harrelson Nissan of South Carolina, LLC*, 2017 WL 9286971, at *14 (D.S.C. May 22, 2017). To this end the Fourth Circuit has been clear that an employer that discourages complaints has not used reasonable care. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 245 (4th Cir. 2000) (employer did not use reasonable care where employee's boss warned her not to take matters to human resources). Here, Payton initially heeded the warnings of her co-workers and supervisors, suffered an increasing amount of harassment, and complained to Human Resources only to have her fear of retaliation fulfilled. Under these circumstances, Defendant was negligent.

3.     <u>Liability may be Imputed to Defendant because it Failed to Take Remedial Action Reasonably Calculated to End the Harassment</u>.

Defendant failed to adequately respond to Payton's reports of harassment. "Title VII… places significant responsibilities on employers in reasonably responding to employee allegations." *Howard v. Winter*, 446 F.3d 559, 570 (4th Cir. 2006). Once the employer has notice of the harassment it must respond with remedial action reasonably calculated to end the harassment. *Sunbelt, supra* at 319 (employer's response was inadequate where harassing employees were warned against further harassment but not issued sanctions or reprimands). The adequacy of an employer's response is a question of fact. *Paroline, supra* at 106 ("The adequacy of Unisys' remedy is a question of fact which a court may not dispose of at the summary judgment stage if reasonable minds could differ as to whether the remedial action was 'reasonably calculated to end the harassment.'").

Here, Defendant's response was not at all adequate. Hovatter and Langton took no action at all and Human Resources undertook an investigation that consisted of reviewing limited video recordings it has not preserved and interviewing only the witnesses most likely to deny the harassment. Hollister claims to have interviewed only Olinger, Hovatter (who says he was not interviewed), and Langton. Ex. A-04, J.R. 120-121 (Hollister dep. p. 15:12- p. 16:13). Each of these individuals would presumably have suffered consequences had Payton been harassed as Olinger was responsible for the harassment and Hovatter and Langton failed to act on her complaints. Payton asked that all her co-workers be interviewed and specifically drew Defendant's attention to Amber Navalaney, who also had been harassed.  Ex. A-04 J.R. 162 (Exhibit 3 to the Deposition of Sheri Hollister); Ex. A-09 J.R. 934 (Exhibit P to the deposition of Lisa Payton). Defendant failed to speak to her. Had Defendant interviewed Jana Cannon, one of Payton's co-workers, it would have learned that she had witnessed Olinger harassing Payton. Ex. E, J.R. 1167-1168 (Cannon decl. at ¶¶ 1-7). Conducting either of these interviews would have confirmed Payton's allegations.

Defendant also failed to review all the relevant video recordings. Payton requested a review of all Friday and Saturday shifts, but Defendant only reviewed Friday July 14, 2017 and Wednesday July 19, 2017. Exhibit H, J.R. 1232-1233 (Exhibit 1 to the Deposition of William Liggett). Defendant did not preserve any of the footage it reviewed even though it is capable of doing so. Ex. A-07, J.R. 355; 374-75 (Liggett dep. p. 22:9-19; p. 41:17-p. 42:2:5). These facts clearly evidence a lack of reasonable care.

Defendant's investigation of Payton's complaint to Human Resources was critical to her rights as an employee. Had Defendant interviewed Amber Navalaney or Jana Cannon as Payton requested, it would have concluded that Olinger had engaged in sexual harassment and terminated

him, thus sparing Payton from reassignment to ALM and continued harassment from Olinger. Because the investigation of a sexual harassment complaint is critical to protecting the rights of harassment victims, liability may be imputed to an employer based upon its failure to conduct a reasonable investigation. *Amirmokri, supra* at 1131–32 (imputing liability where harassment investigator failed to interview harassment victim's entire workgroup); *Federal Express, supra* at 610 ("There is no evidence to suggest why Federal Express completed its investigation with a finding that no sexual harassment had occurred without having interviewed several of the [identified] witnesses …."); *EEOC v. Big Lots Stores, Inc*., 2018 WL 4656413, at *7 (N.D.W.Va. Sep. 27, 2018) (perfunctory investigation is evidence of failure to use reasonable care). *See also Miles, supra* at 832–33 (failure to conduct interviews of identified witnesses evidenced lack of reasonable care.). Further, reassigning Payton to ALM was not an effective remedial measure because it strongly discouraged her from making further complaints. An employer may not remedy sexual harassment by giving the victim a detrimental assignment. *See Ellison v. Brady,* 924 F.2d 872, 882 (9th Cir. 1991) ("We strongly believe that the victim of sexual harassment should not be punished for the conduct of the harasser. We wholeheartedly agree with the EEOC that a victim of sexual harassment should not have to work in a less desirable location as a result of an employer's remedy for sexual harassment."). EEOC Compliance Manual (CCH) § 615.4(a)(9)(iii), ¶3103, at 3213 (1988)"); *Steiner v. Showboat Op. Co.,* 25 F.3d 1459, 1464 (9th Cir.1994), *cert. denied,* 513 U.S. 1082 (1995) ("a victim of sexual harassment should not have to work in a less desirable location as a result of the employer's remedial plan") (and the cases cited therein); *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 812 (7th Cir. 2000) ("Quality's authority to transfer Hostetler is not in question; the reasonableness of the transfer as a remedial measure is. Title VII obligates an employer to take appropriate corrective measures when it

19

knows or has reason to know that one of its employees is sexually harassing another.") (citations omitted). Accordingly, numerous material issues of fact preclude summary judgment.

### D.    Defendant Retaliated Against Payton by Assigning Her to ALM.

The record evidence demonstrates that reassigning Payton to ALM was retaliatory. To establish a prima facie case of retaliation, an employee must show that: "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Matvia v. Bald Head Island Management, Inc.,* 259 F.3d 261, 271 (4th Cir. 2001). There is record evidence demonstrating a material issue of fact regarding all three elements.

1.    By Reporting Sexual Harassment Payton Engaged in a Protected Activity.

Payton reported Olinger's harassment to Hovatter, Langton, and Human Resources. The Fourth Circuit has held that complaining about harassment is a protected activity. *Kubicko v. Ogden Logistics Servs.,* 181 F.3d 544, 551–52 (4th Cir. 2015). Therefore, there is a material issue of fact regarding the first element of the prima facie case for retaliation.

2.    It is Undisputed that Payton was Reassigned to ALM because She Reported Sexual Harassment.

Defendant has conceded that it separated Payton and Olinger because of Payton's complaints. ECF No. 38-1 Def. Memo at 12. Once separated, Olinger worked at OTR and Payton was primarily assigned to ALM. Ex. 09, J.R. 512 (Nies dep. p. 53:18-22). Payton's protected activity was therefore the direct cause of her loss of shifts at OTR.

3.    Reassignment to ALM Was an Adverse Action.

The third element, adverse action, is demonstrated by Defendant assigning Payton to work at ALM, a snack bar, instead of OTR, the largest bar in the casino. Ex. A-11, (J.R. 684)

20

(Payton dep. p. 56:13-21); Exhibit D, J.R. 1116-1118, 1131 (Hovatter p. 19:16-p. 21:18; p. 34:9-11). Ex. F, J.R. 1185, 1209-1210 (Langton dep. p. 17:11-20; p. 41:9-42:14). Defendant incorrectly argues that "[p]roof of an adverse action turns on 'whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating.'" ECF No. 38-1 Def. Memo at 19. The Supreme Court has rejected this standard. *Carter Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("We therefore reject the standards applied in the Courts of Appeals that have…. limited actionable retaliation to so-called ultimate employment decisions.) (internal quotations omitted). The *Burlington* Court held that retaliation under Title VII is established upon proof that the employer engaged in conduct that a reasonable employee would have found to be materially adverse. *Id.* at 68. An action is materially adverse if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (internal citations omitted). To this end, unfavorable reassignment constitutes an adverse action. *Id.* at 70-71.

Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances'" and is a question for the jury. *Id.* Here there is extensive evidence that ALM is a significantly less favorable assignment than OTR. Working at ALM is harder because one bartender is responsible for making coffee, sandwiches, pizza, fries, burgers and snack items, Ex. A-05, J.R. 209 (Jay dep. p. 46:8-18); Ex. A-11, J.R. 684 (Payton dep. p. 56:13-21), and generates fewer tips because patrons do not tip on food items. Ex. A-11, J.R. 684 (Payton dep. p. 56:13-21); Exhibit F, J.R. 1209-1210 (Langton dep. p. 41:9-p. 42:14). Conversely, every drink at OTR generates a tip. Ex. A-11, J.R. 784-785 (Payton dep. p. 156:17-p. 157:7).

It is well-settled that a decrease in income constitutes an adverse employment action. *Ray v. International Paper Company*, 909 F.3d 661, 670 (4th Cir. 2018) (citing *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999) (explaining that an actionable adverse employment action is one in which an employee suffers a "discharge, demotion, *decrease in pay or benefits*, loss of job title or supervisory responsibility, or reduced opportunities for promotion") (emphasis in original). Reassignment to ALM resulted in a loss of income for Payton. She was making as much as $200 a night at OTR but then as little as $35 a night at ALM. Ex. A-11, J.R. 732-733 (Payton dep. p. 104:17-p. 105:14). Payton's recollection of $200 a night is consistent with Olinger's testimony that he makes $200 to $350 a night at OTR. Ex. A-10, J.R. 585 (Olinger dep. p. 24:5-13). Defendant's management confirms that ALM was less lucrative than OTR. Ex. A 02, J.R. 27-28 (Arbogast dep. p. 14:21-p. 15:1).

Courts have specifically held that changing a food and beverage employee's assignments in a manner that causes a reduction in tips is an adverse action. *Ortiz v. Big Bear Events LLC*, 2013 WL 247444, at *3 (W.D.N.C. Jan. 23, 2013) (denying motion to dismiss where plaintiff plead that Defendant refused to allow her to work additional shifts that would have resulted in additional tips.). Under facts strikingly similar to those of the instant case, the Seventh Circuit has held that assigning casino employees to an area of the casino that generates less money in tips is an adverse action. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (4th Cir. 2014). There, casino beverage servers complained of race harassment and the employer reassigned them to work in the area surrounding the "penny slots." *Id.* at 975. Patrons who used the "penny slots" were known to be poor tippers. *Id.* Because the reassignment caused a significant loss of income, the Seventh Circuit held it to be an adverse action. *Id.* at 980. Relatedly, the Seventh Circuit held that it was of no consequence that the casino employees lacked documentation regarding their

earnings. *Id.* The plaintiff's first-hand experience in the casino provided a sufficient basis for testimony regarding earnings. *Id.*; *See also EEOC v. Ecology Services, Inc*., 447 F.Supp.3d 420, 446 (D. Md. 2020) (accepting employee's testimony regarding lost earnings as sufficient proof of back pay). Accordingly, there is sufficient evidence that reassignment to ALM was an adverse action.

        4.    <u>Defendant's Argument that It Reassigned Payton Due to the Collective Bargaining Agreement is a Pretext for Retaliation</u>.

Defendant argues that there is a legitimate non-discriminatory basis for its decision to assign Payton to ALM. ECF 38-1 Def Memo at 24. Specifically, it claims that it was required to assign Payton to ALM because Olinger was the senior employee. *Id.* Putting aside the fact that an adequate investigation would have confirmed Payton's allegations and eliminated the need to choose between Payton and Olinger, there are material issues of fact showing that Defendant was not obligated to schedule Olinger based on seniority. Defendant's attempt to use seniority as a justification for the assignments is therefore pretextual. When the plaintiff establishes the prima facie case and presents evidence of pretext, summary judgment is inappropriate. *Reeves v. Sanderson Plumbing Prod. Inc.*, 530 U.S. 133, 147 (2000) ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); *EEOC v. Sears Roebuck and Co*., 243 F.3d 846, 854 (4th Cir. 2001) ("[A] prima facie case and evidence of pretext raises a sufficient inference of discrimination to entitle a plaintiff to survive a motion for summary judgment.").

Defendant is simply not bound by seniority. Its collective bargaining agreement provides that it is to schedule shifts "based upon the Company's analysis of employee skill, ability levels, qualifications, and the needs of the department." J.R. 1039 (collective bargaining agreement). Olinger has worked at ALM on some occasions. Ex. A-10, J.R. 584 (Olinger dep. p. 21:13-18).

Consistent with the terms of the collective bargaining agreement, Defendant's managers have admitted that there is no rule for assigning bartenders to ALM or OTR. Ex. A-02, J.R. 28 (Arbogast dep. p. 15:12-17); Ex. A-09, J.R. 477 (Nies dep. p. 18:4-8). They are expected to work where they are assigned. *Id.*

A plaintiff may demonstrate that an employer has used compliance with a collective bargaining agreement as a pretext for retaliation. *Martin Marietta Corp. v. Maryland Com'n on Human Relations*, 38 F.3d 1392, 1403 (4th Cir.1994) ("[I]t may be that Martin Marietta followed the terms of the CBAs in terminating Price once he was no longer eligible for workers' compensation benefits, but at the same time it may have used the CBA terms as a pretext to engage in retaliatory discharge."). Here, even if Defendant were bound by the collective bargaining agreement to give Olinger priority over Payton, it took more shifts at OTR from Payton than were necessary to protect Olinger's seniority rights.

Payton reported harassment to Hovatter and Langton on Friday, July 14, 2017. Ex. A-11, J.R. 696 (Payton dep. 68:15-20); Ex. I, J.R. 1234 (Exhibit 2 to the Deposition of William Liggett). Prior to the week of July 14, 2017, Payton worked at OTR on Tuesdays and Wednesdays which were Olinger's days off. Ex. B-5, J.R. 1074-1078 (Payton Schedule). Defendant makes its schedule two weeks in advance. Ex. A-09, J.R. 477-478 (Nies dep. p. 18:21-p. 19:6). The weekly schedules beginning two weeks after Payton's July 14, 2017 complaint demonstrate that she was generally not assigned to work at OTR even on Olinger's days off, despite the fact that she had sufficient seniority to hold these shifts prior to reporting harassment. Ex. B-5, J.R. 1080-1088 (Payton Schedule). Thus, even if the collective bargaining agreement gave Olinger scheduling priority over Payton, Defendant went beyond what the agreement called for in spite of Payton's protests that Defendant was retaliating against her. Ex. A-11, J.R. 935

24

(Ex. V to the Deposition of Lisa Payton). These facts are sufficient to establish a triable issue regarding retaliation.

### E.   Defendant Constructively Discharged Payton by Allowing Olinger's Harassment to Continue, Reassigning her to ALM, and Discouraging Complaints of Harassment.

Defendant constructively discharged Payton because she suffered a significant decline in income and was still unprotected from Olinger's harassment. Ex. A-11, J.R. 675-76; 931 (Payton dep. p. 47:17-p. 48:10; Exhibit L to the Deposition of Lisa Payton). The constructive discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that her "working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pennsylvania State Police v. Suders,* 542 U.S. 129, 141 (2004). When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge. *Green v. Brennan*, 578 U.S. 547, 555 (2016). To establish constructive discharge, a claimant must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign and then show that he actually resigned. *Id.* (internal quotations omitted).

Defendant incorrectly argues that EEOC must prove that it intended to cause Payton to resign. *See* ECF 38-1 at 22. This is no longer the law. The requirement of intent was eliminated by the *Green* court. *Green, supra* at 560 ("We do not also require an employee to come forward with proof — proof that would often be difficult to allege plausibly — that not only was the discrimination so bad that he had to quit, but also that his quitting was his employer's plan all along."). The Fourth Circuit has acknowledged that "*Green*'s express holding abrogates our prior case law to the extent it is to the contrary." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 144 (4th Cir. 2017), *cert. denied sub nom. CONSOL Energy Inc. v. EEOC*, 138 S. Ct. 976, 200 L. Ed. 2d

246 (2018). Defendant's argument that it did not act with specific intent to force Payton's resignation is therefore unavailing. EEOC need only show that Payton's working conditions were intolerable.

    1.    <u>The Record Evidence Demonstrates Payton's Working Conditions Were Intolerable</u>.

After the report to Human Resources Payton felt abandoned by management and the harassment continued. Ex. A-11, J.R. 775; 940 (Payton dep. p. 147:11-14; Exhibit Y to the deposition of Lisa Payton). She fought back tears every time a member of management spoke to her and feared that she would "fall apart at work." Ex. A-11, J.R. 938 (Exhibit Y to the Deposition of Lisa Payton). Dealing with the situation at Defendant had affected every aspect of her life. *Id.* Payton wanted to reach out to her family for support but was concerned that the stress would be too much for them. *Id*.

An employee's testimony regarding stress and a hostile work environment creates a triable issue of fact regarding the intolerability of working conditions. *Amirmokri, supra* at 1132. In *Amirmokri* the plaintiff's co-workers used slurs related to his Iranian heritage which caused him "constant stress." *Id.* Here, even after the complaint to Human Resources, Olinger whispered threats into Payton's ear, called her 'bitch" and whispered[11] to her that he could continue to harass her with impunity voicing, "I'll make whatever comments I want to make about your rear-end and nothing is going to be done about it." Ex. A-11, J.R. 724-726; 941 (Payton dep. 96:21-98:18; Exhibit Y to the Deposition of Lisa Payton). This foreshadowed yet further harassment, but Payton did not want to make additional complaints for fear of losing more shifts at OTR. Ex.

---

[11] Harassment based on whispering has been held to create intolerable working conditions for the purposes of a constructive discharge analysis. *Bonar, supra* at *6 N. 5.

A-11, J.R. 729 (Payton dep. p. 101:4-20). Given this Hobson's choice between safety and income, resignation was objectively reasonable.

Additionally, assigning a food and beverage employee to an area of the establishment that generates fewer tips has been held to create intolerable working conditions. *Carter v. California Grill*, LLC, 538 F.Supp.3d 714, 722 (W.D.Tex. 2021) (denying summary judgment on constructive discharge claim). There, the court denied summary judgment where "shortly after [plaintiff] complained to management of racist treatment by colleagues and managers, [defendant] removed her from the bar and began assigning tables in such a way that made it impossible for [plaintiff] to earn money on her shifts." *Id*. Payton's resignation email notes that she is "working harder and getting paid much less." Ex. A-11, J.R. 931 (Exhibit L to the Deposition of Lisa Payton). This loss of income, increased workload, and continuing harassment is sufficient to create a triable issue of fact regarding constructive discharge.

       2.     <u>EEOC's Claim for Constructive Discharge is not Defeated Because Payton's Resignation Email Does Not Mention Harassment</u>.

Because Payton's union representative told her not to further discuss her harassment, her resignation email does not mention it. Ex. A-11, J.R. 931 Exhibit L to the Deposition of Lisa Payton). Ex. A-11, J.R. 678 (Payton dep. p. 50:2-21). As she understood it, the union was representing her regarding the matter and direct discussions with management were inappropriate. Ex. J, J.R. 1237 (Payton decl. at ¶23). She did, however, allude to the harassment and subsequent retaliation by indicating that she was disappointed with a lack of unity and teamwork. *Id.* Courts have held that resignation letters which do not discuss intolerable conditions do not defeat constructive discharge claims. *Lowe v. CUSA, LLC*, 2011 WL 13334284, at *11 (S.D.N.Y. Sep. 29, 2011) ([Plaintiff's] "resignation letter goes to the weight of the evidence of constructive discharge, and it is for the jury to determine whether the letter is fatal to his claims.");

*Giakoumakis v. Maronda Homes, Inc. of Fla.*, 2010 WL 11507432 at *7 (M.D.Fla. Mar. 26, 2010) (denying summary judgment where resignation letter did not address discrimination or intolerable conditions.). Here, Payton's email documents that she is working harder, her pay is low, and her "schedule requests will never be a concern to anyone except" herself. Ex. A-11, J.R. 931 (Exhibit L to the Deposition of Lisa Payton). She further wrote that she had to "be an advocate for her own healthy life." *Id.* The email simply cannot be read as an admission that conditions at Defendant were tolerable.

This case is distinguishable from *Evans v. International Paper Company* where the Fourth Circuit held that the plaintiff's resignation letter, in addition to other evidence, undercut her claim for constructive discharge because it stated that her experience with the defendant was "on the whole, satisfying and productive." Payton's resignation email does not contain an overall positive assessment of her experience with Defendant. Ex. A-11, J.R. 931 (Exhibit L to the Deposition of Lisa Payton). It thanks specific individuals, not including Olinger, and contains the admonition "I hope you take care of the ones who deserve to be heard & respected," which implies that some employees are not being heard and respected. *Id*. Finally, the letter cannot be read to imply that Payton was quitting due to attendance issues. She mentioned attendance points only because the union had advised her against discussing the harassment. Ex. A-11, J.R. 678 (Payton dep. p. 50:9-15). For these reasons, summary judgment cannot be granted against EEOC on the claim for constructive discharge.

## IV.    CONCLUSION

EEOC has offered sufficient evidence to demonstrate every contested element of its claims for sexual harassment, retaliation, and constructive discharge. For these reasons, EEOC requests that the Court deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

/S

_____
DEBRA M. LAWRENCE
Regional Attorney

/S

_____
ERIC S. THOMPSON
Senior Trial Attorney