IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GOLDEN ENTERTAINMENT, INC.<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  Case No. 1:20-cv-02811-LKG<br>)<br>)<br>)<br>) |

**REPLY BRIEF IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Golden Entertainment, Inc. ("Defendant"), by and through undersigned counsel, hereby submits this Reply in Support of its Motion for Summary Judgment. Plaintiff, the U.S. Equal Employment Opportunity Commission ("Plaintiff") brings claims against Defendant on behalf of Lisa Payton ("Payton") for sexual harassment and retaliation/constructive discharge. No genuine issue of material fact exists with respect to any of Plaintiff's claims and Defendant is therefore entitled to judgment as a matter of law.

**I.    INTRODUCTION**

Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Opposition") plays loose and fast with the facts of this case and deposition testimony. When the record evidence did not suit Plaintiff's position, Plaintiff provided a declaration from Payton that either *directly* contradicted the record or, for the first time, created/identified new facts and information *over five-years later*. For example, Plaintiff's Opposition states that a fellow employee, Theresa Jay ("Jay") "warned [Payton] that when women complained about [Olinger's] harassment, the company did not take action against him but, instead, the women lost shifts at OTR or had their hours reduced." (Opposition, ECF No. 39, p. 9.) However, the record establishes that Jay testified

that she had ***never*** heard from anyone else about sexual comments against Brian Olinger ("Olinger") and that, when Payton told her she wanted to report Olinger to the Company for sexual harassment, Jay said to go to Human Resources.  J.R. 0207, 0209-0210 (Jay Depo., pp. 44:7-14; 46:22-47:13.)  Additionally, Payton claims that Amber Navalaney ("Navalaney") reported her own "sexual harassment" experience with Olinger; however, Navalaney herself testified that she made ***no such complaint***.  J.R. 0427, 0440-0441 (Navalaney Depo., pp. 24:9-11; 37:13-38:12).

The Court needs to focus on the record and view it, along with the facts of the case, as they existed back in 2017, not how Payton conveniently recalls them today.  And in doing so, it is clear that summary judgment as a matter of law is appropriate; Plaintiff's claims should be dismissed with prejudice.

## II.   THE UNDISPUTED FACTS

Contrary to Plaintiff's Opposition, the record evidence supports the below-undisputed facts.[1]

### A.   Payton's Employment at Rocky Gap as a Bartender, Including her Schedule

Rocky Gap is a union property, and Defendant is a party to a Collective Bargaining Agreement ("CBA") with UFCW, Local 27.  J.R. 0967-0968, 1025-1059 (Kurtz Decl., ¶¶ 5, 11; *see also* Ex. B-2.)  Plaintiff cannot ignore the fact that Defendant is bound by the terms of a CBA that governs the terms and conditions of employment for those covered bargaining unit employees including, but not limited to, wages, scheduling, seniority, and discipline.  J.R. 0967-0968 (Kurtz Decl*.*, ¶ 5.)  Payton was hired as a bartender at Rocky Gap ***not*** as a bartender at a particular bar, *i.e.* On the Rocks ("OTR").  J.R. 0652-0653, 0918 (Payton Depo., pp. 24:13-25:10; *see also* Payton Depo., Ex. E.)

---

[1] For the Court's review and reference, Defendant has highlighted relevant portions of the Joint Record as referenced in its Motion and Reply in yellow; Plaintiff has highlighted its relevant portions of the Joint Record as referenced in its Opposition in green.

Payton's schedules confirm that she trained *at all* of the bars on property, including both OTR and A Little Munch ("ALM"). J.R. 1073. Bartenders were required to work at their assigned bar based on the schedule. J.R. 0028 (Arbogast Depo., p. 15:2-11.); J.R. 0477 (Nies Depo., p. 18:4-17.) Generally speaking, Defendant would schedule Bartenders based on operational hours and business levels. J.R. 0473 (Nies Depo., p. 14:12-20.) Then, "bartenders [were] filled in on skill-set and seniority." (*Id.*) Scheduling was "***seniority-based***" because of the CBA. J.R. 0027 (Arbogast Depo., p. 14:9-20.) Seniority was based on longevity as well as skill-set. J.R. 0034 (*Id.,* p. 21:3-7.) Payton's schedules confirm that, prior to complaining to Defendant and thereafter, she was typically scheduled to work at **both** OTR and ALM. J.R. 1071-1089 (Kurtz Decl., ¶14, ; *see also* Ex. B-5).

  **B.** **Payton's Complaint of Harassment and Defendant's Contemporaneous Investigation**

On July 19, 2017, Payton complained to Human Resources about both Olinger and another bartender, Jamie Scott ("Scott"). J.R. 0739 (Payton Depo., p. 111:9-19.) Contrary to Plaintiff's Opposition and Payton's Declaration that "on July 19, 2017 Olinger came into work on his day off, approached Payton behind the bar, and again pressed his genitals against her buttocks" (Opposition, ECF No. 39, p. 11, *see also* J.R. 1236-1237, Payton Decl., ¶¶ 18-21), Payton's Complaint to Anne Brown in Human Resources states that the "[l]ast incident was last ***Friday, July 14th***…". J.R. 1231 (emphasis added). She made no reference of a July 19, 2017 incident at any time during her employment with Defendant.

There is no record evidence that Payton (1) complained to Donnie Hovatter ("Hovatter") and/or Richard Langton ("Langton") about Olinger's harassment prior to going to Human Resources; or (2) that either Hovatter or Langton indicated she would lose shifts if she complained. Both Hovatter and Langton testified at their depositions that Payton did not complain to them that Olinger was sexually harassing her, and Hollister's investigation notes corroborate this. J.R. 1091-1092, 1093

(Hollister Decl., Ex. C at ¶ 4; *see also* Ex. C-1); J.R. 1207 (Langton Depo., p. 39:1-6); J.R. 1126, 1138 (Hovatter Depo., pp. 29:1-11; 41:3-11.)

There is also no record evidence that employees discouraged Payton from complaining sooner. Payton's Opposition incorrectly claims that Jay warned her that when women complain about Olinger's harassment, Defendant does nothing and women lose shifts at OTR. (ECF No. 9, p. 3). Jay testified as follows:

Q: did you ever observe a situation where somebody complained about something to Donny Hovatter and he took action against them because they complained"
**A. No.**

*****

Q: …Did you ever observe a situation where somebody made a complaint to Richard Langton and he didn't take any action on it?
A: **No. I'd have to say no**

Q: Did you ever observe a situation where someone made a complaint to Richard Langton and he took action against them for complaining?
A: **No.**

J.R. 0197 (Jay Depo., p. 34:8-18.) Jay further testified that ***no other women she worked with had complaints against Brian Olinger*** and that she never witnessed anything at Rocky Gap that she believed to be sexual harassment. J.R. 0209-0210 (Jay Depo., p. 46:22-47:13.) Finally, Jay testified she told Payton that, if she felt that Olinger touched her inappropriately, she needs to go to Human Resources. J.R. 0207 (Jay Depo., p. 44:7-14.)

Upon learning of Payton's complaint to Human Resources, Human Resources conducted an investigation, which included speaking with Payton, Olinger, Hovatter, and Langton. Payton did not identify any witnesses to the alleged harassment in her complaint to Anne Brown. J.R. 1231 (Payton Depo., Ex. N). Payton also provided a written statement, which did not identify any witnesses to Olinger's conduct. J.R. 0934-0935 (Payton Depo., Ex. R). Additionally, Hollister's notes do not reflect that Payton identified any witnesses to Olinger's alleged harassment. J.R. 0162 (Hollister Depo., Ex. 3.) However, five years later, Payton now identifies Jana Cannon ("Cannon") as a witness;

4

she did not identify her in any written statement or complaint to Human Resources back in 2017. J.R. 1231 (Payton Depo., Ex. N); J.R. 0934-0935 (Payton Depo., Ex. R); J.R. 0162 (Hollister Depo., Ex. 3).[2] What is even more confusing is that on the date in question, *i.e.* July 14, 2017, Cannon was scheduled to work at ALM from 12:00 a.m. to 8:00 a.m., but Olinger's shift at OTR ended at 12:00 a.m.—it unclear when Cannon allegedly witnessed any purported harassment. J.R. 1078.

During Defendant's investigation, three separate individuals also viewed video footage *that was available to them* at that time based on the dates Payton herself complained about and from the video footage available for review. J.R. 0282-0283, 0127, 0352 (Kurtz Depo., pp. 43:4-44:5; Hollister Depo., p. 22:13-19; Liggett Depo., p. 19:5-9). There was no contact observed between Payton and Olinger. J.R. 0360-0361 (Liggett Depo., pp. 27:19-28:4). The only shift that was not reviewed that Plaintiff takes issue with was July 7, 2017 and, Payton baselessly declares now that, had Defendant reviewed that shift, it would have highlighted unwanted sexual conduct. (Opposition, ECF No. 39, p. 13).

Based on the statements made by Olinger and Payton, as well as speaking with Hovatter, Langton, and three separate employees reviewing surveillance footage of Payton working with Olinger, Defendant could not corroborate Payton's claim for sexual harassment. The results of the investigation were ultimately communicated to Payton, to which Payton does not dispute. J.R. 0825-0826, 0828, 0940 (Payton Depo., pp. 197:4-198:9; 200:12-21; *see also* Payton Depo., Ex. Y, EEOC_0002091).

---

[2] In fact, Payton only first identified Cannon during her March 9, 2022 deposition and then subsequently identified her in supplemental discovery responses on March 15, 2022. It is convenient that now, five years later, Plaintiff identified witnesses to alleged sexual harassment that occurred over five years ago, did not identify any witnesses at the time the alleged harassment complaint was made, and obtained a declaration from Cannon in February, 2022 without producing the same in discovery and only now including it in Plaintiff's Opposition.

Further, while Payton may have told Human Resources that Amber Navalaney complained about Olinger sexually harassing her, (J.R. 0162; Hollister Depo., Ex. 3), there is no evidence of any such complaint because ***Navalaney did not complain***.  Navalaney testified that she, "never had an issue with Brian, we honestly worked well as a team" and that she never saw Olinger engage in any kind of sexual activity towards Payton.  J.R. 0420, J.R. 0423 (Navalaney Depo., pp. 17:4-6; 20:13-20.)  Notably, Navalaney testified that while she did tell Plaintiff that Olinger sexually harassed her, she did not report the incident because she just asked Olinger to say, "excuse me" next time rather than coming into close contact.  J.R. 0425, 0427, 0441 (Navalaney Depo., pp. 22:3-8, 24:9-11, 38:5-15.)  Navalaney herself testified that she did not witness Olinger grope Payton, press himself up against Payton, whisper in Payton's ear, or witness Payton complain about any of the aforementioned conduct.  J.R. 0437- 0438 (Navalaney Depo., 34:21-35:19).  Finally, Payton's deposition testimony that "Amber" quit as a result of Olinger's conduct is also inaccurate.  J.R. 0697 (Payton Depo., 69:6-17).  Navalaney remained employed at Rocky Gap through 2020, years after Payton quit.  J.R. 0426-0427 (Navalaney Depo., pp. 23:19-24:4.)

### C. The Record is Clear — Payton's Schedule was Predominantly Controlled by the CBA and Bartenders with More Seniority Returned to Work

The person preparing Payton's schedule ***did not know*** of Payton's Complaint and communicated this to her immediately when she inquired if her schedule was impacted by her sexual harassment complaint.  Arbogast replied that "***was not the case as [he was] just learning about this.***" J.R. 0048-0049 (Arbogast Depo., Ex. 1, emphasis added.)  The Company's position ***has always been*** that scheduling was based more on seniority and that Scott and Christopher Smith's ("Smith") return to work impacted the schedule.[3]  J.R. 0048-0049.  Payton's own deposition testimony confirms that she was aware she had Scott's shifts at OTR.  J.R. 0743 (Payton Depo., 115:1-11).  Payton's

---

[3] Scott was reinstated with full seniority on June 26, 2017 as part of a Grievance resolution and Smith had just returned from a leave of absence.  J.R. 0968 (Kurtz Decl., ¶ 9.)

deposition testimony also confirms that she was unaware of Smith or Scott's seniority status, skills, and qualifications. J.R. 0795-0796 (Payton Depo., pp. 167:20-168:20.) According to Payton's own deposition testimony, after she began working more shifts at ALM, Olinger ***did not*** make comments of a sexual nature to Payton while she would work her shifts at ALM. J.R. 0779 (Payton Depo., p. 151:6-11).

> **D.   There is no Record Evidence that Payton was Told to Conceal the Real Reason for her Resignation or That her Shifts at ALM Resulted in Less Income**

In 2017, Payton's stated reasons for her resignation were ***unrelated*** to her complaint of sexual harassment and/or job reassignment; her resignation email clearly indicates that she could no longer get to work on time and would therefore continue to accumulate attendance points. J.R. 0931-0932 (Payton Depo., Ex. L.). Payton also indicated that she was only being assigned to ALM where she was working harder and getting paid less; however, Payton testified that her wage rate remained the same. J.R. 0685 (Payton Depo., p. 57:1-7.) There is no record evidence of Payton's loss of income. Her pay statements do not demonstrate one. J.R. 1060-1069 (*See generally* Ex. B-3.) And Payton failed to provide her tax returns showing what cash tips, if any, she reported to the IRS to demonstrate and corroborate her purported loss of tip income. J.R. 0789 (Payton Depo., p. 161:7-9). Further, the only evidence Payton provides that she was told not to mention the real reason for her resignation is her own deposition testimony and newly submitted Declaration. Curiously, neither Plaintiff nor Payton identify the person who instructed her to not reference her Complaint.

### III.  LEGAL ARGUMENT

> **A.   The Alleged Conduct Does Not Rise to Sexual Harassment or Create a Hostile Work Environment and, Presuming it Did, Defendant is not Liable**
>
> **1.   Conduct is Not Severe and Pervasive**

To determine whether there is an abusive working environment, a court must consider the totality of the circumstances. *Harris v. Forklift Systems, Inc.,* 114 S.Ct. 367, 370–71 (1993). A court must examine the claim from both a subjective and objective perspective. *Id.* The court

7

should consider various factors, such as, the frequency and nature of the conduct, and its effect on the employee's work performance. *Id.* A plaintiff must show that a reasonable person in his position would find the defendant's conduct created a hostile environment. *Id.*

There is no dispute that in the 5 weeks Payton was employed prior to complaining, Olinger and Payton only worked a total of 9 shifts together. J.R. 1071-1078. Thereafter, they did not work any shifts together. J.R. 1078-1089. Based upon what was alleged back in 2017, such conduct clearly does not amount to severe and pervasive work environment as a matter of law. *See Brown v. The Marjack Co.*, 2010 WL 419389, at *4 (D. Md. Jan. 29, 2010), *see also Meritor Sav. Bank, SSB v. Vinson*, 477 U.S. 57, 67 (1986).

There is no independent evidence to corroborate Payton's 11th hour addition of "regular" harassment, including when on Olinger's days off or when Payton and Olinger were not scheduled together. Regardless, Plaintiff does not refute that the facts of this matter are akin to those in *Hosey v. McDonald's Corp.,* 71 Fair Empl. Prac. Cas. (BNA) 201 (D. Md. 1996), aff'd , 113 F.3d 1232 (4th Cir. 1997) (finding no actionable harassment where the plaintiff was the target of unwanted advances, offensive remarks, and inappropriate touching over a four month period, including allegations that the harasser had pinched or touched his "seat" on ten occasions, and remarked that "she would like to know what it felt like to have [plaintiff] inside her.")

Consequently, as a matter of law, this claim has no merit.

    **2.**    **Defendant Immediately Investigated Payton's Complaint, and Such Investigation was not Perfunctory**

An employer is liable for coworker harassment ***only if*** the employer was "negligent with respect to the offensive behavior." *Vance v. Ball State Univ.,* ⸺ U.S. ⸺, 133 S.Ct. 2434, 2441, 186 L.Ed.2d 565 (2013). An employer is liable for harassment by the victim's coworkers only "if it knew or should have known about the harassment and failed to take effective action to stop it." *Howard v. Winter,* 446 F.3d 559, 565 (4th Cir. 2006) (quoting *Ocheltree,* 335 F.3d at

8

334). Once the employer has notice, then it must respond with remedial action "reasonably calculated to end the harassment." *Amirmokri v. Baltimore Gas and Electric Co.,* 60 F.3d 1126, 1131–32 (4th Cir. 1995); *see also Howard,* 446 F.3d at 570–71. An employer is liable for coworker harassment if it was negligent in controlling working conditions, *i.e.*, if it knew or should have known about the harassment and failed to take prompt and effective remedial action reasonably calculated to ending the harassment and preventing its recurrence. *Strothers v. City of Laurel, Maryland*, 895 F.3d 317, 332 (4th Cir. July 6, 2018); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 319 (4th Cir. 2008).

Here, there is no dispute that the Company had a policy preventing harassment or that Payton was aware of the policy—she testified that she attended training and Payton was familiar with the complaint procedures. J.R. 0736 (Payton Depo., p. 108:4-14. *"After I told the managers and I realized that they weren't going to do anything about it, I knew per orientation and the handbook the next step was to go to HR, human resources."*); J.R. 0924 (Payton Depo., at Ex. H). There is also no dispute that Payton reported Olinger's alleged harassment to Defendant's Human Resources department on July 19, 2017. J.R. 0739 (Payton Depo., 111:17-19). And other than Payton's own testimony, there is no record evidence that Payton complained to Hovatter and/or Langton about Olinger prior to going to Human Resources. J.R. 1093, J.R. 1137-1138, 1141-1142 (Hovatter Depo, 40:4-41:15; 44:10-45:19); J.R. 1195-1196, 1210 (Langton Depo, 27:21-28:17; 42: 16-19).

Further, the undisputed facts in this case demonstrate that, once Defendant knew about Payton's allegations of sexual harassment, it **immediately,** *i.e.* within 24 hours of receiving Payton's complaint, took all appropriate action to conduct a legally sufficient investigation. Hollister spoke with both Payton and Olinger and took notes from those interviews. J.R. 0162-0163 (Hollister Depo. at Ex. 3). Hollister also spoke with Langton and Hovatter and determined that Payton had not previously complained to either one about Olinger's purported conduct. J.R. 1093 (Hollister Decl. at Ex. C-1). Hovatter and Langton's deposition testimony corroborates this.

9

J.R. 1137-1138, 1141-1142 (Hovatter Depo, 40:4-41:15; 44:10-45:19); J.R. 1195-1196, 1210 (Langton Depo, 27:21-28:17; 42: 16-19).

To the extent Plaintiff contends that Olinger continued to harass her or make comments to **other employees** following her complaint, this is entirely based on hearsay. And, even if true, the record demonstrates that **Payton did not inform Defendant of the continued harassment**. J.R. 0729, 0775-0776 (Payton Depo., 101:4-20; 147:15-148:10). The relevant inquiry is whether Defendant's response was adequate toward attempting to prevent future harassment, which it was: "Title VII does not require that the employer's response to a plaintiff's complaints of supervisory sexual harassment successfully prevented subsequent harassment, only that the employer's actions were reasonably likely to check future harassment." *Savino v. C.P. HallCo.,* 199 F.3d 925, 933 (7th Cir. 1999); *see also Wilson v. Dimario,* No. 97-2252, 1998 WL 168346 at *2 (4th Cir. Mar. 31, 1998) (holding that an employer does not have to make the most effective or convenient response, only an adequate response) (unpublished). Defendant cannot be accountable for correcting or attempting to correct harassment that it was not aware of and that it just learned about five years after the fact. Defendant could only operate on the knowledge and information it was provided *at the time* and it did so.

> **B.  The Record Does not Support a Finding of Retaliation or Pretext for Defendant's Conduct**
>
> **1.  Payton Did Not Suffer an Adverse Employment Action with her Schedule**

An actionable adverse employment action must be substantial, and one that is objectively a serious and material change in the terms, conditions, or privileges of employment. It is well-settled that not everything that makes an employee unhappy is an actionable adverse employment action. The inquiry is not whether the decision is prudent or fair, but "whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets, Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999). Reassignments "can only form the basis of a valid…claim if the Plaintiff can show that the reassignment had some significant

10

detrimental effect on her." *Carson-Johnson v. Baltimore City Police Dept.,* 2021 WL 3930098, * 4 (D. Md. Sept. 2, 2021) (*citing Boone v. Goldin,* 178 F.3d 253, 255-257 (4th Cir. 1999)). "[A] reassignment does not constitute an adverse employment action when the reassignment causes no reduction in compensation, job title, level or responsibility, or opportunity for promotion." *Carson-Johnson,* 2021 WL 3930098, * 4 (*quoting Polastre-Jackson v. Colvin,* No. ELH-17-228, 2017 WL 6501800, at *13 (D. Md. Dec. 15, 2017)). Absent a decrease in compensation, job title, level of responsibility or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position. *Boone,* 178 F.3d at 256-57.  Mere dissatisfaction with work assignments does not rise to the level of an adverse employment action.  *Heiko v. Colombo Savings Bank, F.S.B.,* 434 F.3d 249, 262 (4th Cir. 2006)(*citing James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 378 (4th Cir. 2004)).

Payton's sole retaliation contention is that Defendant retaliated against her by reassigning her to a "less lucrative" opportunity where she made less tip income.  However, the record evidence demonstrates that Payton was hired as a bartender at Rocky Gap not at OTR—she was trained at all of the facilities and was **regularly scheduled to work at both OTR or ALM** before and after she complained. J.R. 1071-1089.  In fact, prior to complaining, Payton worked both Friday and Saturday night at OTR only two weeks.  J.R. 1075-1076.  The other three weeks she would only work 1 weekend night shift at OTR—either a Friday night or a Saturday night.  J.R. 1074, 1077-1078.  The other Friday or Saturday nights she was scheduled to work at ALM prior to complaining. *Id.*

Further, having shifts at ALM did not decrease Payton's level of responsibility.  If anything, the record reflects that bartenders had somewhat more responsibility working at ALM than they would at OTR which may have caused some modest stress that was not present when working at OTR.  J.R. 0675-0676 (Payton Depo., 47:19-48:2).

11

Plaintiff's cite to two non-binding authorities, *Ortiz v. Big Bear Events, LLC,* 2013 WL 247444, at *3 (W.D.N.C. Jan. 23, 2013) and *Alexander v. Casino Queen, Inc.,* 739 F.3d 972 (7th Cir. 2014), for the proposition that changing work assignments that results in a reduction in tips is an adverse action. However, *Ortiz* and *Alexander* are distinguishable. In an unpublished opinion from the Western District of North Carolina, *Ortiz* merely decided whether the Complaint in that matter alleged sufficient facts supporting a cause of action for retaliation to survive dismissal at the pleadings stage. The Court used a plausibility standard to determine whether the Plaintiff "has sufficiently alleged facts"; it did not evaluate whether there was a genuine issue of material fact to support an adverse action. *Ortiz,* 2013 WL 247444, *2-3.

In *Alexander,* the cocktail waitresses would periodically bid on shift assignments based on seniority and, the Plaintiffs in *Alexander* were the second- and sixth- most senior waitresses, allowing them to win their preferred areas on the casino floor and that reassignments were only done on a day-by-day occurrence when a waitress was absent, etc. *Alexander,* 739 F.3d at 980. The Plaintiffs in *Alexander* began receiving less lucrative reassignments ***despite*** their shift bids and assigned areas causing them financial impact ***which they could establish*** based on their tenure with the Casino, *i.e.* 15 and 18 years of employment. *Id.* The Plaintiffs also established that their floor reassignments were quite regular. *Id.* Payton ***was not*** the most senior bartender at Rocky Gap nor did she have a shift bid/shift assignment to work exclusively at OTR, as the Bartenders were required to work at the locations in which they were assigned. J.R. 0028 (Arbogast Depo., 15:7-11). Further, Payton was not a tenured employee of 15 or 18 years to establish a concrete loss of income claim; she worked at Rocky Gap for approximately five weeks before complaining of harassment and, as such, her speculative financial impact allegations do not compare to that of the established financial impact the servers in *Alexander* had. Her testimony regarding how Bartenders are tipped is even incorrect; Bartenders receive a portion of the beverage servers' tips and are also obligated to give the bar backs a percent of their tips. J.R. 0968 (Kurtz Decl., ¶ 7.)

However, Defendant does not have a policy requiring the Bartenders to pool or share their tips with one another. (*Id.*)

Given a lack of objective evidence, Plaintiff has not generated a factual dispute to "show that the reassignment had some significant detrimental effect on her." *Carson-Johnson,* 2021 WL 3930098, * 4 (*citing Boone,* 178 F.3d at 255-257).

### 2. Facts Do Not Support a Finding of Pretext for Retaliation; Defendant has Provided Legitimate, Nondiscriminatory Reasons for Its Employment Actions

If plaintiff establishes a *prima facie* claim for retaliation, defendant can "show that its purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." *Foster v. Univ. of Maryland–E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015). The burden then "shifts back to the plaintiff to demonstrate that the employer's purported non-retaliatory reasons 'were not its true reasons, but were a pretext for discrimination.'" *Lewis v. Baltimore City Bd. of Sch. Commissioners*, 187 F. Supp. 3d 588, 595–96 (D. Md. 2016) (internal citations omitted). "'[P]retext is a lie, not merely a mistake." *Price v. Thompson,* 380 F.3d 209, 213-16, n.1 (4th Cir. 2004)(citation omitted)(abrogated on other grounds by *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)) (quoting *Jordan v. Summers*, 205 F.3d 337, 344 (7th Cir. 2000)). Defendant has provided a consistent, legitimate, non-discriminatory explanation, through record evidence, and Plaintiff has offered nothing other than speculation and conjecture to contradict this explanation. *Holland v. Washingtron Homes, Inc.,* 487 F.3d 208, 216 (4th Cir. 2007)(quoting *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006))("'Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it.'"). This is not a situation where Defendant provided one explanation to Plaintiff and another to the Court or otherwise "change[d] its story after it [could not] support its initial story. *Id.*, at fn. 7. In the Fourth Circuit, the ultimate

13

question for pretext is whether the decision-makers honestly believed their explanation for the decision at issue. *Holland v. Washington Homes, Inc.,* 487 F.3d at 217. There is nothing in the record to suggest otherwise.

Defendant has continuously and consistently articulated its legitimate, non-discriminatory reasons for Payton working shifts at ALM. What is more, Plaintiff has proffered no evidence which would suggest that Defendant's reason for the schedule is unworthy of credence or that Defendant's true motive in scheduling Payton was because she complained of harassment. Plaintiff cannot meet its burden of demonstrating by a preponderance of the evidence that Defendant's explanation for her schedule is pretext and that Defendant's true motive in Payton's schedule was because she complained of harassment.

On the very same day that Payton complained to Defendant, *i.e.* July 20, 2017, Arbogast told Payton that her schedule had nothing to do with her complaint, that he just found out about her complaint and that **scheduling was based on seniority**. J.R. 0001; 0048-0049 (Arbogast Depo., Ex. A-2, Ex. 1.) In August 2017, when Payton subsequently asked again about her shifts, Defendant *again* reminded her that the schedule was based on seniority and employee days off and that it would "keep an eye out for opportunities to schedule her [at OTR] when possible" which it did. J.R. 0104 (Hendrixson Depo., Ex. 6.); J.R. 0104 (*Id.*) Defendant's business decision and reasons have not waivered before this Court from what was conveyed to Payton and, viewing the record as a whole, Defendant's explanation has been consistently articulated. Further, , "it is not the job of the Court to determine whether the reason was fair or correct, so long as it truly was the reason for the employer's action." *See Felix v. Sun Microsystems, Inc.,* No. CIV JFM-03-1304, 2004 WL 911303, *20-21 (D. Md. Apr. 12, 2004) (*citing Hawkins v. Pepsico, Inc.,* 203 F.3d 274, 279 (4th Cir. 2000); *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 272 (4th Cir. 2005) ("We do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants.") (*quoting DeJarnette v. Corning, Inc.,* 133 F.3d 293, 299 (4th Cir. 1998).

Despite Plaintiff's efforts to create confusion in its Opposition by introducing speculation, Payton's self-serving declaration and deposition testimony, inferences and assumptions, there are no genuine issues of material fact, and Defendant is entitled to judgment as a matter of law on Plaintiff's retaliation claim.

### 3. Defendant Did Not Constructively Discharge Payton

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that [her] 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, ––– U.S. ––––, 136 S. Ct. 1769, 1776, 195 L.Ed.2d 44 (2016) (*quoting Pennsylvania State Police v. Suders*, 542 U.S. 129, 141, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)). In such situation, Title VII treats the employee's resignation as being tantamount to an actual discharge. *Id.* "A claim of constructive discharge therefore has two basic elements": (1) the plaintiff must show that she was "discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign;" and (2) the plaintiff must show that she "actually resigned." *Id.* at 1777. The level of intolerability required to state a claim of constructive discharge is higher than the showing required for a hostile work environment claim. *See Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). The demanding standard is not met by allegations suggesting that a reasonable person would have viewed resignation as the wisest or best decision. *Evans*, 936 F.3d at 193. Instead, the plaintiff must show that her working conditions became so intolerable that a reasonable person "would have had no choice but to resign." *Evans*, 936 F.3d at 193 (internal quotation marks and citations omitted) (emphasis in original). "'Unless conditions are beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress.'" Id. (*quoting Suders*, 542 U.S. at 147, 124 S.Ct. 2342). *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1353–54 (4th Cir.1995) (plaintiff must establish facts that show not only deliberateness of employer's actions but also intolerability of

15

working conditions); *see Honor v. Booz–Allen & Hamilton, Inc.*, 383 F.3d 180, 186–87 (4th Cir. 2004); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255–56 (4th Cir. 1985).[4]

Here, Plaintiff has failed to show that Payton's working conditions after she complained were so intolerable that she could do nothing but resign. In fact, Defendant was not aware of any ongoing allegations of sexual harassment that would contribute to an intolerable work environment, thus depriving Defendant of an opportunity to correct the same. Defendant cannot be responsible for Plaintiff's employment decision to resign if she did not make it aware that the alleged behavior did not stop, no can Defendant be responsible for such revisionist facts that come out years after she left.

As such, judgment as a matter of law is warranted in Defendant's favor.

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

. . .

---

[4] "Intolerability of working conditions ... is assessed by the objective standard of whether a "reasonable person" in the employee's position would have felt compelled to resign. An employee may not be unreasonably sensitive to his working environment. Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress." *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985) (citations omitted) (emphasis added), cert. denied, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986).

## IV. **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Court grant Defendant's Motion for Summary Judgment in its entirety and dismiss this case as a matter of law.

Dated:  November 30, 2022.                    Respectfully submitted,

/s/ *Dana B. Salmonson*
Anthony L. Martin (*admitted pro hac vice*)
Dana B. Salmonson (*admitted pro hac vice*)
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. Charleston Blvd., Suite 500
Las Vegas, NV  89135
Tel:  (702) 369-6800
Fax:  (702) 369-6888
anthony.martin@ogletree.com
dana.salmonson@ogletree.com

Robert R. Niccolini, D. Md. No. 24873
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
1909 K Street, N.W., Suite 1000
Washington, DC  20006
Tel:  (202) 887-0855
Fax:  (202) 887-0866
robert.niccolini@ogletreedeakins.com

*Counsel for Defendant*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) |
| **Plaintiff,** | ) ) |
| v. | ) ) Case No. 1:20-cv-02811-LKG |
| GOLDEN ENTERTAINMENT, INC. | ) ) ) |
| **Defendant.** | ) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 30th day of November, 2022, the foregoing was filed with the Clerk of the Court using the CM/ECF System, which will serve notification upon the following counsel of record:

Debra M. Lawrence
Eric Stephen Thompson
United States Equal Employment Opportunity Commission
Baltimore Field Office
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201-2525
*Counsel for Plaintiff*

DATED: November 30, 2022.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

/s/ *Dana B. Salmonson*

Anthony L. Martin (*pro hac vice*)
Dana B. Salmonson (*pro hac vice*)
10801 W. Charleston Blvd., Suite 500
Las Vegas, NV 89135

Robert R. Niccolini
D. Md. No. 24873
1909 K Street, N.W., Suite 1000
Washington, DC 20006
*Attorneys for Defendant*